```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  2/15/2024
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Laura Capezza,**

                         **Plaintiff,**

              **-against-**

**Martin O'Malley, Commissioner of Social**
**Security,[1]**

                         **Defendant.**

**23-cv-01813 (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Laura Capezza ("Capezza" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB"). (Compl., ECF No. 1.) Presently before the Court are Plaintiff's motion for summary judgment and the Commissioner's brief in opposition.[2] (Pl.'s Mot., ECF No. 10; Comm'r Br., ECF No. 14.) For the reasons set forth below, Plaintiff's motion is denied and the decision of the Commissioner is affirmed.

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley shall be substituted for Kilolo Kijakazi as the defendant in this suit.

[2] As the Commissioner points out, the current Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g) and Standing Order No. 22-mc-00329 (LTS) establish simplified procedures and provide that the parties' submissions presenting these actions for decision will be styled as briefs. (Comm'r Br. at 1 n.1.) Regardless of how Plaintiff styled her motion, the Court's review of the Commissioner's decision is the same. *See* 42 U.S.C. § 405(g).

**BACKGROUND**

I.      **Procedural Background**

Capezza filed an application for DIB on September 21, 2020 with an alleged disability onset date of March 20, 2020. (Administrative R., ECF No. 9 ("R."), 147-48.) The Social Security Administration ("SSA") denied her application on December 22, 2020 and again, following reconsideration, on June 9, 2021. (R. 161, 182, 187-98, 211-24.) Thereafter, Capezza filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (R. 225-27.) On October 27, 2021, Capezza appeared for a hearing before ALJ Kieran McCormack. (R. 104-46.) Capezza was represented at the hearing by attorney Yocasta Duran. (R. 104.)

In a decision dated November 22, 2021, ALJ McCormack found Capezza not disabled from her alleged onset date of March 20, 2020 through the date of the ALJ's decision.[3] (R. 43-52.) On December 2, 2021, Capezza requested review of the ALJ decision from the Appeals Council. (R. 36, 39.) The Appeals Council denied her request for review on February 17, 2023, making ALJ McCormack's decision the Commissioner's final decision. (R. 1-3.) This action followed.

II.     **Non-Medical Evidence**

Born on March 20, 1969, Capezza was 51 years old on the alleged onset date and 52 years old at the time of the ALJ's decision. (R. 147.) Capezza has a high school education and past work as an electrician. (R. 136, 341.)

---

[3] To qualify for DIB, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (C); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured. Capezza's date last insured is December 31, 2024. (R. 147.)

III.    **Medical Evidence Before the ALJ**[4]

A.    **May 2020 Through November 2020 Treatment Records**

On May 13, 2020, Capezza saw Dr. Michael Cushner, M.D. of WestMed Medical Group for a worker's compensation visit[5] complaining of bilateral hand pain. (R. 528-35.) Capezza reported increased pain over the prior three years of working as an electrician. (R. 528.) Dr. Cushner noted that Capezza had seen a hand specialist three years prior and had trigger finger in the middle finger[6] and had undergone carpal tunnel release 15 years ago.[7] (*Id.*) Capezza reported pain and discomfort across her right thumb with locking multiple fingers, numbness and pain, as well as difficulty with activity. (*Id.*) Dr. Cushner noted that examination of the wrist revealed "extension 45 [and] flexion to 30" and "diffuse pain and numbness across the palms, going along medial and ulnar nerve distributions[,]"[8] "thickening along the A1 pulleys with pain with direct contact" and "minor pain along the dorsal portions." (*Id.*) Dr. Cushner also noted that X-rays reviewed that day showed overall normal alignment with no evidence of acute fracture, dislocation, displacement

---

[4] Because Plaintiff's arguments relate only to her physical impairments, the Court, like the parties, focuses on the medical evidence related to those impairments. (*See* Pl.'s Mem. at 4-7; Comm'r Br. at 3 n.4.)

[5] Plaintiff filed worker's compensation claims in January and/or March 2020 based on multiple, small injuries at work. (*See* R. 416, 528-29.)

[6] "Trigger finger is a condition affecting tendons that flex the fingers and thumb, typically resulting in a sensation of locking or catching" when bending and straightening the affected digits. Trigger Finger, OrthoInfo, https://perma.cc/XQC6-W22Q.

[7] "During a carpal tunnel release, a surgeon cuts through the ligament that is pressing down on the carpal tunnel[,]" which "makes more room for the median nerve and tendons passing through the tunnel, and usually improves pain and function." *See* Carpal Tunnel Release, Johns Hopkins Medicine, https://perma.cc/W59D-F7LY.

[8] "The ulnar nerve is a nerve that travels from the wrist to the shoulder" and "is mainly responsible for movement of the hand[.]" *See* Ulnar Nerve, Healthline, https://www.healthline.com/human-body-maps/ulnar-nerve. The median nerve, which traverses the carpal tunnel as it enters the hand, provides sensory and motor functions to the forearm, wrist and hands. *See* Median Nerve, Cleveland Clinic, https://perma.cc/4BHY-D8EK.

or lesion. (*Id*.) Dr. Cushner diagnosed Capezza with right hand pain, right hand injury, right hand neuralgia[9] with weakness, and left hand pain and left hand neuralgia and weakness. (R. 531.) Dr. Cushner gave Capezza braces to wear at night, prescribed meloxicam gel and recommended that she consider Electromyography ("EMG") to assess the nerve component.[10]  (R. 530, 534.)

Capezza saw Nurse Practitioner ("NP") Massiel Grullon for a virtual follow-up visit on June 10, 2020. (R. 416-19.) Capezza reported ongoing pain, numbness and tingling in her hands. (R. 416.) Capezza reported that she couldn't open medicine bottles, had difficulty holding a pen/pencil and had difficulty with hand grip and strength. (*Id*.) She also reported locking of her thumbs and index fingers. (*Id*.) Capezza was wearing wrist splints at night and using the meloxicam gel and aspercream "with benefit." (*Id*.) NP Grullon assessed Capezza's hand pain as unchanged. (R. 417-18.) NP Grullon referred Capezza to Dr. Stephen Andrus, M.D. for an EMG to evaluate her for carpal tunnel syndrome. (R. 418). NP Grullon continued Capezza's previous treatment and noted that Capezza could schedule an in-office visit for an injection for trigger finger and should call if she decided to have that procedure. (*Id*.) On June 23, 2020, Capezza saw Dr. Cushner for an injection in her right thumb. (R. 523-25.)

On July 2, 2020, Capezza saw Dr. Andrus for a consult. (R. 421-30.) Capezza reported "sharp and stabbing" pain with "intermittent numbness." (R. 426.) A Phalen's test[11] and carpal

---

[9] "Neuralgia is a type of pain caused by a nerve that's irritated or damaged nerve." *See* What You Need To Know About Neuralgia, https://perma.cc/GW9Z-GYYQ.

[10] "EMG is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons)." *See* Electromyography ("EMG"), https://perma.cc/VED8-TRAV.

[11] "Phalen's maneuver is done by pushing the back of the hands together for one minute[,] which "compresses the carpal tunnel to produce carpal tunnel syndrome symptoms." *Obenza v. Comm'r of Soc. Sec.*, No. 19-CV-05444 (VSB) (SDA), 2020 WL 3001635, at *8 n.9 (S.D.N.Y. May 8, 2020), report and recommendation adopted, 2020 WL 3000398 (S.D.N.Y. June 3, 2020). "If the symptoms worsen when the

compression test were positive. (R. 424.) Dr. Andrus recommended scheduling an EMG of the upper extremities, noting that Capezza had "clinically significant apparent [carpal tunnel syndrome]" and had not improved with conservative measures over a three-to-four-week period, but that a diagnosis of carpal tunnel syndrome was "still in question" and the EMG was needed to rule out other "entrapments [or] radiculopathy." (R. 430.) Dr. Andrus also noted that "surgery [was] being contemplated[.]" (*Id*.)

On August 1, 2020, Capezza went to the Emergency Department at St. Anthony Community Hospital complaining of dyspnea, or shortness of breath, "mostly on exertion." (R. 432-55; *see also* R. 637-709.) Capezza was concerned because she had a history of pulmonary embolism more than 10 years before and had been on blood thinners for two years but had not been on medication since. (R. 432.) Capezza also reported that her chest pain was a "recurrent problem" and that it "occur[ed] constantly" but was mild and did not radiate. (*Id*.) On examination, Dr. Brutus Sargaine, M.D. noted that her pulmonary effort was normal. (R. 434.) A CT of the chest revealed no pulmonary edema but "minimal irregularity posterior right ninth and tenth ribs questionable for nondisplaced fractures" and "degenerative changes[.]" (R. 436; *see also* R. 441-43). Capezza was discharged home the same day. (R. 437.)

On November 4, 2020, Dr. Vito Loguidice, M.D. performed an independent orthopedic examination of Capezza for a worker's compensation claim. (R. 508-15.) Capezza reported pain in both her hands that did not feel better compared to when she had started treatment in June 2020. (R. 509.) Capezza reported that her pain was an eight on a scale of one to ten and that her

---

maneuver is performed, it indicates a positive Phalen's sign." *Id*. "A positive Phalen's sign may be an indication of the presence of carpal tunnel syndrome." *Id*.

pain was sharp and pulling with shooting pain from the palms of her hands to her fingers. (*Id.*) Capezza also reported difficulty with stairs and that she could sit for a few hours before being in too much pain. (*Id.*)

On examination of the right wrist, Dr. Loguidice noted volar operative scarring, positive Tinel's sign at the wrist,[12] positive Phalen's test at two seconds; abnormal sensation and grip strength, abductor brevis strength at 4/5, a palmer nodule at the base of the right long finger and right thumb and long finger trigger finger. (R. 509-10.) In addition, Capezza had reduced range of motion in dorsiflexion and volar flexion. (R. 510.) On examination of the left wrist, Dr. Loguidice noted volar operative scarring, positive Tinel's sign at the wrist, positive Phalen's test at two seconds; abnormal sensation and grip strength, abductor brevis strength at 4/5, a palmer nodule at the base of the left ring finger and long finger trigger finger. (*Id.*) In addition, Capezza had reduced range of motion in dorsiflexion and volar flexion, although to a lesser degree than in her right wrist. (*Id.*) Dr. Loguidice diagnosed sprain/carpal tunnel syndrome in both wrists and recommended an EMG/NCS of the upper extremities. (*Id.*) Dr. Loguidice opined that Capezza was capable of "light duty work" with the restriction that she avoid fine manipulation with either hand. (R. 511.) He also noted that maximum medical improvement had not been reached. (*Id.*)

On November 5, 2020, Capezza saw Dr. Cushner for a follow-up visit. (R. 517, 519-22.) Capezza reported ongoing pain with pain overnight when she was sleeping. (R. 517.) Capezza reported that the previous injection for right thumb trigger finger had helped for a couple of

---

[12] "Tinel's maneuver is performed to produce carpal tunnel syndrome symptoms and is done by tapping the median nerve in the wrist." *Obenza*, 2020 WL 3001635, at *8 n.8. "A positive test is found when the tapping causes worsening of the tingling in the fingers." *Id.* "A positive Tinel's sign is an indication of the syndrome." *Id.*

months but then the pain started to come back. (*Id*.) She also reported locking of the right thumb. (*Id*.) Dr. Cushner noted extension and flexion in both wrists of 80+. (R. 520-21.) Dr. Cushner diagnosed carpal tunnel syndrome and trigger finger in her right thumb. (R. 521.) He also performed another right thumb trigger finger injection. (R. 522.)

On November 12, 2020, Capezza saw Dr. Christos Iakovou, M.D. of Northwell Health complaining of increasing dyspnea on exertion and cough. (R. 536-38.) Dr. Iakovou recommended a pulmonary function test and that Capezza use an Albuterol inhaler in the meantime.[13] (R. 537, 882-86.)

**B.**     **December 1, 2020 Internal Medicine Consultative Examination – Dr. Kautilya Puri, M.D.**

On December 1, 2020, Capezza saw Dr. Kautilya Puri, M.D., for an internal medicine consultative examination. (R. 556-59.) On examination, Dr. Puri found that Capezza had full range of motion in her wrists and that her hand and finger dexterity were intact, but that Capezza's grip "show[ed] some give-way strength secondary to local tenderness when gripping." (R. 558.) An X-ray of the right hand showed no acute osseous abnormality. (R. 558, 560.) Dr. Puri opined that Capezza did not have any objective limitations to communication, fine motor or gross motor activity or gait; had mild limitations to activities of daily living on examination that day; had mild limitations to bilateral upper extremity tasks and to squatting, bending, stopping and kneeling; and recommended that she be seen by a psychologist and "not carry out strenuous activities." (R. 559.)

---

[13] The Court notes that the Record contains additional medical records from WestMed Medical Group between November 13, 2020 and May 10, 2021. (R. 57-99.) It appears that these records were not considered by the ALJ because they were not timely submitted. (*See* R. 43.) Plaintiff does not raise any arguments regarding these records. Accordingly, the Court does not consider them herein.

C.   **January 2021 Through April 2021 Treatment Records**

On January 15, 2021, Capezza saw Dr. Iakovou for a follow-up appointment for hyperreactive airway disease.  (R. 577-79, 876-81.) Dr. Iakovou noted that a pulmonary function test indicated a "significant bronchodilator response." (R. 579.) Dr. Iakovou prescribed medication and recommend that Capezza use a mask at work because dust at work was "clearly adding to her symptoms." (*Id*.)

On March 12, 2021, Capezza saw Dr. Andrus for an EMG and nerve conduction study to rule our median neuropathy at the wrist. (R. 859-60.) Dr. Andrus found that was electrophysiologic evidence of moderate bilateral median neuropathy at the wrist consistent with Capezza's post-surgical status (history of bilateral carpal tunnel release) and noted that this should be correlated for symptoms of active carpal tunnel syndrome. (R. 860.) Dr. Andrus further noted that there was no evidence of ulnar neuropathy at the elbow or wrist in either extremity. (*Id*.)

On April 15, 2021, Capezza saw Dr. Iakovou for a follow-up appointment relating to her history of obstructive airway disease.  (R. 870-74.) Dr. Iakovou noted that Capezza was "OK" on her current medications and that treatment adjustment would depends on symptomatic needs and she should follow up with her primary medical doctor. (R. 870-71.)

On April 21, 2021, Capezza underwent an X-ray -of her left hip due to reported pain. (R. 861.) Dr. Kari Schlessinger, M.D. found mild hip joint narrowing. (*Id*.) There was "[n]o evidence of fracture, dislocation, or other significant osseous abnormality . . . normal bony mineralization . . . [and] vascular calcifications." (*Id*.) The impression reported was "[m]ild hip joint narrowing." (R. 861.)

On April 28, 2021, Capezza underwent release of right thumb trigger finger surgery performed by Dr. Cushner, as well as bilateral wrist carpal tunnel cortisone injections. (R. 857-58.) Dr. Cushner noted that Capezza had a "[t]hickened A1 pulley with impingement upon flexor tendon with minor fraying." (R. 857). During the procedure, the A1 pulley was described as "thickened and rhine-like." (*Id.*) Dr. Cushner removed a "[portion] of the volar surface" to "prevent reoccurrence." (*Id.*) Dr. Cushner noted that, following surgery, Capezza was unable to work until June 17, 2021, at which time she could return to work without restriction. (R. 858.)

### D.      **May 11, 2021 Internal Medicine Consultative Examination – Dr. Kautilya Puri, M.D.**

On May 11, 2021, Capezza saw Dr. Puri for a second internal medicine consultative examination. (R. 590-97.) Dr. Puri noted Capezza's history of COPD/emphysema with episodes of shortness of breath and joint pain in the neck, hip and hands. (R. 590.) Dr. Puri also noted that Capezza had undergone trigger finger surgery on the right hand two weeks prior with continued local pain post-surgery. (*Id.*) On physical examination, Dr. Puri noted that Capezza had a normal gait, the ability to stand on heels and toes but not walk on them, "squat moderately halfway decreased[,]" and that she needed no help changing or getting on and off the exam table and was able to rise from the chair without difficulty. (R. 591.) Dr. Puri also found full range of motion of the shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally and that Capezza's joints were stable and nontender except for knee and back tenderness on palpation and movement. (R. 592.) Capezza's strength was 5/5 in the lower and upper extremities. (*Id.*)

In terms of fine motor activity, Dr. Puri noted that hand and finger dexterity on the right was mildly decreased, though Capezza could carry out tasks, and left hand and finger dexterity was intact. (R. 592.) Dr. Puri also noted that Capezza's grip strength on the right showed "some

degree of give-way strength secondary to local tenderness, though is at least 4/5 but not assessed secondary to recent surgery." (R. 592-93.) Left grip was 5/5. (R. 593.) Dr. Puri opined that Capezza did not have any objective limitations to communications; had mild limitations to fine motor movements of her right hand secondary to recent surgery; had no objective limitations to gross motor movements; had no objective limitations to gait; had mild limitations to gripping on a short-term basis and to her activities of daily living on examination that day; had mild to moderate limitations in squatting, bending, stooping and kneeling and moderate limitations to lifting weights. (R. 593.) Dr. Puri recommended that Capezza not work from heights, with heavy machinery, or be allowed to drive a car and that to be careful in dark situations. (*Id*.) Dr. Puri also "recommended that she not be in an environment which would increase her respiratory complaints." (*Id*.)

E.    **July 2021 Through September 2021 Treatment Records**

On July 12, 2021, Capezza saw Dr. Iakovou for a follow-up appointment relating to her obstructive airway disease. (R. 864-69.) Dr. Iakovou prescribed a two-week sample of Trelegy and continued Capezza on the Albuterol inhaler. (R. 865.)

On August 16, 2021, Capezza went to the emergency room at St. Anthony Community Hospital complaining of leg pain and a redness in both legs. (R. 714-15.)  Dr. Ronald Roshe, M.D. diagnosed "[p]retechial rash" and "paronychia of toe" and prescribed medication. (R. 719, 724.)

On September 14, 2021, Capezza went to the emergency room at St. Francis Hospital complaining leg swelling in both legs, redness, right lower leg pain beginning the day before, and redness in her left lower ankle. (R. 788.) She also complained of dyspnea on exertion beginning that afternoon and noted that she was "normally very active, without any limitations, but started

to feel winded after climbing flights of stairs." (R. 789.)  Capezza underwent a duplex ultrasound of the bilateral lower extremities and a chest CT in response to her leg swelling. (R. 793.) Dr. Santoshi Indrakanti, M.D. concluded that there was "[n]o sonographic evidence of [deep vein thrombosis] in the bilateral lower extremities." (R. 799.) Capezza also received a chest X-Ray, which showed "no acute cardiothoracic process" and an EKG, which was unremarkable.[14] (R. 793.)

## IV.  The October 27, 2021 Administrative Hearing

### A.  Plaintiff's Testimony

Capezza, along with counsel, appeared via telephone for an administrative hearing on October 27, 2021. (R. 104-46.) Capezza testified that, following her alleged onset date, she had tried to return to work in June 2020, but it was a "failed attempt." (R. 116-17.) Capezza testified that she missed a lot of work and wasn't able to stand on her feet or walk and was laid off by her employer on October 8, 2020. (R. 117-18.) Capezza further testified that she first left work in March 2020 because of her hands and lungs. (R. 119.) With respect to her hands, Capezza testified that she kept dropping things, couldn't tighten and was getting trigger finger in both her middle fingers and her right thumb. (R. 119-20.) Capezza explained that following her surgery in April 2021 she still had trouble holding things and could grip for only a short period of time, but she could grip utensils to eat a meal and could drive for short periods of time. (R. 120-22.) Capezza testified that due to diabetic neuropathy she could not sit for long periods of time because she got numbness in her feet and the same was true if she stood for long periods of time, so she

---

[14] Plaintiff submitted additional medical evidence from WestMed Medical Group from 2022 to the Appeals Council, but the Appeals Council found that such evidence did not relate to the period at issue and declined to consider it. (R. 2, *see also* R. 10-33 (March 2022 through April 2022 records).) Accordingly, the Court does not address this later evidence. In any event, the Court notes that Plaintiff does not raise any arguments with respect to evidence.

needed to alternate between sitting and standing. (R. 123.) She also testified that she could lift about 20 pounds and could sit for about 45 minutes before needing to get up and walk, but could not stand and walk for more than 30 minutes without needing a break. (R. 128.) When asked why she stopped working as an electrician, Capezza testified that she couldn't endure the pain in her feet. (R. 134.) In response to questions from her attorney, Capezza testified that she had trouble lifting laundry due to carpal tunnel but did not have trouble folding. (R. 135-36.)

**B.      Vocational Expert Testimony**

Vocational Expert ("VE") James Soldner also testified at the hearing. (R. 137-44.) The ALJ asked VE Soldner whether there would be jobs in the national economy for a hypothetical person of Capezza's age, education and work history who had the RFC to perform the full range of light work, except that the individual could squat, bend, stoop, and kneel on a frequent basis; could handle and finger with both hands on a frequent basis; could work at jobs that did not contain concentrated exposure to airborne irritants, such as fumes, odors, dust, gases, and/or smoke; could work at jobs that did not require the operation of motor vehicles; and could work at jobs that did not contain concentrated exposure to unprotected heights, unprotected machinery, and/or machinery with moving mechanical parts. (R. 137-38.) VE Soldner testified that such a person could not perform Capezza's past work as an electrician, but there were no transferable skills and the hypothetical person could perform the jobs of Officer Helper (DOT No. 239.567-010), Mail Clerk (DOT No. 209.687-026) and Cashier II (DOT No. 211.462-010). (R. 138-41.)

The ALJ next asked about a second hypothetical person with the same restrictions except limited to sedentary work and not light work. (R. 141.) VE Soldner testified that this would preclude past relevant work and there were no transferable skills, but did not identify separate

jobs that such person could perform. (*Id*.) The ALJ also asked about whether the jobs from hypothetical one would be available if the person was off task 15 percent of the workday, to which VE Soldner answered no, that typically 10 percent or less off-task behavior was tolerated. (R. 142.) Capezza's attorney asked VE Soldner if the jobs identified in hypothetical one would still be available if the hypothetical person further was limited to occasionally handling with the right hand and occasionally reaching bilaterally. (R. 143.) VE Soldner responded that the work as a Mail Clerk and Cashier II would be precluded, but the work as an Office Helper would remain. (*Id*.) VE Soldner further testified that additional jobs of a School Bus Monitor (DOT No. 372.667-042) and Counter Clerk (DOT No. 249.366-010) would also be available with those limitations. (R. 143-44.)

**V.      ALJ McCormack's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Capezza had not engaged in substantial gainful activity between March 20, 2020 and November 22, 2021. (R. 46.) The ALJ noted that Capezza testified that she worked full time as an electrician from June 2021 through October 2021, but had to stop working due to her impairments and that the work was for less than six months. (*Id*.) Thus, the ALJ found this work to be an unsuccessful work attempt.[15] (*Id*.)

At step two, the ALJ determined that Capezza had the following severe impairments: bilateral carpal tunnel syndrome; diabetes mellitus; diabetic neuropathy; hypertension; and chronic obstructive pulmonary disease. (R. 46.) The ALJ also found that Capezza had non-severe

---

[15] "An unsuccessful work attempt is one that involves work of six months or less that ceases or reduces due to the claimant's impairments." *Paris F. v. Comm'r of Soc. Sec.*, No. 20-CV-06724S (WMS), 2022 WL 2092904, at *4 (W.D.N.Y. June 10, 2022) (citing 20 C.F.R. § 404.1574 (c)(4)). "If a period of work qualifies as an unsuccessful work attempt, it will not be considered to demonstrate an ability to engage in substantial gainful activity." *Id*.

impairments of right thumb trigger finger, gastroesophageal reflux disease, anemia and anxiety disorder. (*Id*.) In finding Capezza's anxiety disorder non-severe, the ALJ considered the "paragraph B" criteria[16] and found that Capezza had no limitation in the four areas. (R. 46-47.) Accordingly, the ALJ found that the paragraph B criteria were not satisfied. (R. 47.)

At step three, the ALJ found that Capezza did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 47.) The ALJ specifically considered Listing 1.18. (*Id*.)

The ALJ then assessed Capezza's RFC and determined that she was able to perform light work, as defined in 20 CFR §404.1567(b)[17] except that she could squat, bend, stoop, and kneel on a frequent basis; could handle and finger with both hands on a frequent basis; could work at jobs that did not contain concentrated exposure to airborne irritants such as fumes, odors, dusts, gases, and/or smoke; could work at jobs that did not require the operation of motor vehicles; and could work at jobs that did not contain concentrated exposure to unprotected heights, unprotected machinery, and/or machinery with moving mechanical parts. (R. 47-48.)

At step four, the ALJ found that Capezza was unable to perform her past relevant work as an electrician. (R. 50-51.) At step five, the ALJ considered Capezza's age, education, work experience and RFC and concluded, based on VE Soldner's testimony, that there were jobs existing in significant numbers in the national economy that Capezza could perform, including

---

[16] The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." 20 C.F.R. § 404, Subpt. P, App'x 1. They are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id*. To satisfy the paragraph B criteria, a claimant's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id*.

[17] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

Office Helper, Mail Clerk and Cashier II. (R. 51-52.) Therefore, the ALJ found that Capezza was not disabled during the relevant period and denied her claim for benefits. (R. 52.)

## LEGAL STANDARDS

### I.   Standard Of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the

claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R.

§ 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 50-51.

### III.   Regulations Regarding Consideration Of Medical Opinions And Prior Findings For Applications Filed On Or After March 27, 2017

Under the regulations applicable to Plaintiff's claim, the ALJ considers five factors in evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 CFR § 404.1520c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 404.1520c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the

more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 CFR § 404.1520c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* § 404.1520c(b)(2) (emphasis added).

An ALJ must provide sufficient explanation to allow a reviewing court to "trace the path of [the] adjudicator's reasoning." *Amber H. v. Saul*, No. 20-CV-00490 (ATB), 2021 WL 2076219, at *6 (N.D.N.Y. May 24, 2021) (quoting *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819 (F.R.), 82 Fed. Reg. 5844-01, at *5858 (Jan. 18, 2017) ("We expect that the articulation requirements in these final rules will allow a . . . reviewing court to trace the path of an adjudicator's reasoning . . . .")). An ALJ commits "procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record." *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022). However, a court can "affirm if 'a searching review of the record' assures [the court] 'that the substance of the [regulation] was not traversed.'" *Id.* (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)).

## DISCUSSION

Plaintiff argues that this action should be remanded because the ALJ erroneously found that Capezza could handle and finger on a frequent basis; the ALJ erroneously found that she

could squat, bend, stoop and kneel on a frequent basis; the ALJ failed to properly evaluate the opinion of Dr. Loguidice; the ALJ's RFC assessment is not supported by substantial evidence and the ALJ failed to comply with SSR-96-8p; and, finally, that the hypothetical posed to the vocational expert did not reflect all of Capezza's limitations and, therefore, did not adequately support the ALJ's conclusion. (Pl.'s Mem., ECF No. 11, at 10-16.) The Court first addresses Plaintiff's argument regarding the ALJ's evaluation of Dr. Loguidice's opinion and then turns to her remaining arguments.

## I.  The ALJ's Evaluation Of Dr. Loguidice's Opinion

In her memorandum, Plaintiff argues that further evaluation of Dr. Loguidice's opinion is needed because his opinion was consistent with the medial evidence. (Pl.'s Mem. at 12-13.) In her reply, Plaintiff argues that the that ALJ erred by failing to sufficiently consider the supportability and consistency factors. (Pl.'s Reply Mem., ECF No. 15, at 2-5.) The Commissioner argues that the ALJ properly considered the required factors and reasonably determined that Dr. Loguidice's opinion that Capezza needed to avoid fine manipulation with her hands was inconsistent with record evidence showing intact hand and finger dexterity. (Comm'r Br. at 11-12.)

The ALJ found that Dr. Loguidice's opinion was supported by his treating relationship with Capezza and her history of carpal tunnel syndrome, but concluded that it was "not fully persuasive" because it was inconsistent with other medical evidence in the record, including the findings of the consultative examiner that Capezza's hand and finger dexterity were intact despite some reduced strength in the upper extremities. (R. 49.) Although the ALJ did not discuss Dr. Loguidice's specific examination findings in detail, he concluded that the opinion was supported

by Dr. Loguidice's examination (the only treatment of Dr. Capezza by Dr. Loguidice in the record) and other records establishing her diagnosis of carpal tunnel syndrome. (*Id*.) Moreover, a searching review of the record assures the Court that the substance of the regulation was not traversed. *See Estrella*, 925 F.3d at 96. The ALJ found the opinion less than fully persuasive, not because it was unsupported, but because it was inconsistent with other evidence in the record, such as Dr. Puri's opinions from December 2020 and May 2021. (R. 49; *see also* R. 50 (discussing persuasiveness of Dr. Puri's opinions).) Thus, although the ALJ's discussion of the supportability factor could have been more robust, the Court finds that the ALJ adequately explained how he considered the supportability and consistency factors in assessing the persuasiveness of Dr. Loguidice's opinion. *See Rodriguez v. Kijakazi*, No. 21-CV-02358 (JCM), 2022 WL 3211684, at *13 (S.D.N.Y. Aug. 9, 2022) (finding no error in ALJ's evaluation of medical opinion when clear from discussion that ALJ considered supportability and consistency factors).

## II.     **The ALJ's RFC Determination**

Plaintiff's remaining arguments primarily pertain to the ALJ's RFC determination. First, Plaintiff argues that the ALJ erroneously found that Capezza could handle and finger on a frequent basis, pointing to evidence that she contends supports a greater restriction. (Pl.'s Mem. at 10-11.) However, the issue for the Court is not whether substantial evidence supports Plaintiff's position, but "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013). The Court must "defer to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).

The Court finds that the ALJ's determination regarding Plaintiff's ability to handle and finger was supported by substantial evidence. The ALJ relied upon the two consultative

examinations by Dr. Puri showing, at most, mildly reduced hand and finger dexterity in the right hand and somewhat reduced (4/5) grip strength in the right hand. (*See* R. 50 (discussing evidence supporting frequent bilateral hand and finger limits).) The ALJ also concluded that a limitation to frequent handling and fingering was supported by the totality of the evidence that lacked "any abnormal objective clinical finding pertaining to [Capezza's] hands and wrists." (*Id*.) It is well settled that "[a] consultative examiner's opinion may constitute substantial evidence if otherwise supported by the record." *Grega v. Saul*, 816 F. App'x 580, 582-83 (2d Cir. 2020) (citing *Mongeur*, 722 F.2d at 1039). Moreover, it is up to the ALJ to weigh conflicting evidence "to make an RFC finding that [is] consistent with the record as a whole." *Schillo v. Kijakazi*, 31 F.4th 62, 78 (2d Cir. 2022) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)).

Having considered the record as a whole, the ALJ reasonably determined that although Capezza suffered from carpal tunnel syndrome and had some ongoing symptoms, she maintained the ability to frequently handle and finger and the Court cannot say that a reasonable factfinder would have to conclude otherwise. *See Ronald B. v. Comm'r of Soc. Sec.*, No. 20-CV-00904 (WBC), 2021 WL 5745673, at *6 (W.D.N.Y. Dec. 2, 2021) (RFC determination limiting plaintiff to frequent handling and fingering supported by substantial evidence including consultative examinations showing intact hand and finger dexterity and grip strength); *Elizabeth H. v. Comm'r of Soc. Sec.*, No. 3:19-CV-01020 (CFH), 2020 WL 4501495, at *5 (N.D.N.Y. Aug. 5, 2020) (consultative examiner's opinion that plaintiff had "mild limitations to gripping" supported RFC determination of light work with frequent handling and fingering).

Similarly, substantial evidence supports the ALJ's determination that Capezza could squat, bend, stoop and kneel on a frequent basis. Plaintiff again points to evidence which she contends

supports greater restrictions (*see* Pl.'s Mem. at 11-12), but has not shown that the ALJ's determination was not supported by substantial evidence. *See Ponzini v. Comm'r of Soc. Sec.*, 20-CV-02522 (LJL), 2021 WL 4441512, at *9 (S.D.N.Y. Sept. 28, 2021) ("The Court cannot reweigh the evidence on substantial evidence review.") Among the evidence Plaintiff points to is Dr. Puri's finding that Capezza had moderate limitations in these areas, but such limitations are consistent with a determination that she is capable of light work. *See Gerry v. Berryhill*, No. 17-CV-07371 (JS), 2019 WL 955157, at *3 (E.D.N.Y. Feb. 26, 2019) ("Courts within this Circuit have held that opinions of similar 'mild to moderate limitations' support RFC findings that claimants are capable of 'light work.'") (citing cases). Accordingly, the Court finds no basis to disturb the ALJ's decision on this ground.

Plaintiff also argues that the ALJ erred by failing to make function-by-function assessment of her limitations as required by SSR 96-8p. (*See* Pl.'s Mem. at 15.) However, as the Commissioner contends, "[w]here an ALJ's analysis regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, remand is not necessary merely because an explicit function-by-function analysis was not performed." *Domm v. Colvin*, 579 F. App'x 27, 28–29 (2d Cir. 2014) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (internal quotation marks and alterations omitted). The Court finds that that was the case here. As set forth above, the ALJ applied the proper legal standards and his RFC determination is supported by substantial evidence. Thus, a further function by function assessment was not required.

### III.   <u>The ALJ's Step Five Determination</u>

Finally, Plaintiff argues that the ALJ's step five finding is not supported by substantial evidence because the ALJ's hypotheticals to the VE did not reflect all of her limitations. (Pl.'s Mem. at 16.) "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (internal citations, quotation marks and alterations omitted). Because I find that the ALJ's RFC determination is supported by substantial evidence, there is no merit to Plaintiff's claims that the ALJ's hypotheticals to the VE reflecting his RFC analysis were inadequate to support the ALJ's conclusion. *See Tanya W. v. Comm'r of Soc. Sec.*, No. 20-CV-00510 (TWD), 2021 WL 4942092, at *12 (N.D.N.Y. Oct. 22, 2021) ("Because this Court has found the ALJ's RFC determination was supported by substantial evidence, it also finds the ALJ's hypothetical to [the VE] was proper, and his step five determination was supported by substantial evidence."); *Everett v. Colvin*, No. 15-CV-06215 (MAT), 2016 WL 524404, at *5 (W.D.N.Y. Feb. 10, 2016) (same) (citing *Burnette v. Colvin*, 564 F. App'x 605, 609 (2d Cir. 2014)).

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment (ECF No. 10) is denied and the decision of the Commissioner is affirmed. *See* 42 U.S.C. § 405(g). The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:      New York, New York
            February 15, 2024

_____
STEWART D. AARON
United States Magistrate Judge